William A. DENNY, Plaintiff-Appellant,

v.

Orville R. MERTZ and McGraw-Hill, Inc., Defendants-Respondents.†

Court of Appeals

*No. 80–436. Argued November 20, 1980.—*
*Decided January 15, 1981.*
(Also reported in 302 N.W.2d 503.)

† Petition to review granted. COFFEY, J., took no part.

For the plaintiff-appellant there was a brief by *Denny and Yanisch* of Milwaukee. Of counsel was *James J. Kriva.* Oral argument by *William Denny.*

For the defendants-respondents there were briefs by *Don Peterson* of *Minahan & Peterson, S.C.,* of Milwaukee and *L. C. Hammond* and *David B. Kern* of *Quarles & Brady* of Milwaukee. Oral argument by *Don Peterson* and *L. C. Hammond.*

Before Moser, P.J., Scott, J., and Donlin, J.

MOSER, P.J. William A. Denny (Denny) appeals from summary judgments dismissing his libel claims against McGraw-Hill, Inc. (McGraw-Hill) and Orville R. Mertz (Mertz). Judgment in favor of McGraw-Hill was entered February 27, 1980, and judgment in favor of Mertz was entered March 3, 1980. The trial court determined that Denny "thrust himself to the forefront" of a public controversy and was therefore required to establish that an allegedly libelous statement was made with actual malice. The court concluded that Denny's failure to establish actual malice entitled McGraw-Hill and Mertz to summary judgment. We disagree with the trial court and reverse.

Mertz was board chairman and chief executive of the Koehring Company (Koehring) until 1975. Denny was corporate attorney for Koehring from 1954 until 1969. Denny and his family owned about 4,400 shares of stock in Koehring and between 1969 and 1974 the value of Denny's stock dropped from $45 to $5 per share. Concerned about what was happening to stock value, Denny became a vocal protagonist against the management of Koehring. Denny and others began a campaign to remove Mertz as an officer of Koehring and to change management.

In furtherance of these goals, Denny wrote numerous letters to stockholders to obtain proxies and contacted members of Koehring's board of directors. He instigated national and state securities investigations against Koehring. He wrote to the *Wall Street Journal* suggesting the newsworthiness of the events occurring at Koehring. Several stories had already appeared in the Milwaukee newspapers about shareholders' meetings and the securities investigations. The *Wall Street Journal* thereafter published a few stories on the problems at Koehring.

As a result of the efforts of Denny and his fellow dissidents, Koehring's board of directors was enlarged from ten members to twelve members, providing seats on that board for two dissident stockholders. This change in directors lead to Mertz's resignation from his position as chairman of the board on December 5, 1975.

Denny also instituted two stockholders' suits to inspect Koehring's books and shareholders' records. Those suits, as well as Denny's attendance at the annual shareholders' meeting in March of 1975, were the subjects of stories in both the *Milwaukee Sentinel* and *The Milwaukee Journal*. Denny was described as a vocal, persistent, and principal protagonist against Koehring's management policies.

■

Subsequent to Mertz's resignation, David G. Santry (Santry), a contributing editor of *Business Week,* wrote an article about the management overthrow at Koehring entitled *Top Management Ferment at Koehring.* That article, published on January 19, 1976, contained the following statements and formed the basis of this libel action:

Mertz now claims he was the target of a "harrassment [*sic*] campaign" by the dissidents, who include the company's largest individual shareholder, a former chairman deposed by Mertz 16 months ago, and a former general counsel.

. . . .

Also about that time, William Denny, general counsel of Koehring until Mertz fired him in 1969, began to question many of Koehring's management decisions. He even sued the company twice to get minutes of meetings and other information.

In his deposition, Santry revealed that he obtained the background for the article from various telephone interviews with dissident Koehring stockholders, including Denny, whom Santry characterized as his "treasure trove of information." Denny also supplied Santry with numerous documents. Santry also interviewed both Mertz and his successor as chairman of the board and chief executive of Koehring. After the article was published, Denny called Santry and explained that he was not "fired" as that article stated, but that he resigned. Mertz also wrote Santry and stated that Denny was not fired. Mertz requested that the erroneous statement be corrected. A correction appeared in the March 1, 1976, edition of *Business Week* stating that Denny resigned and was not fired.

On October 18, 1976, Denny filed this action for libel. Both Mertz and McGraw-Hill moved to dismiss for failure to state a cause of action because a false statement

that a person was "fired" could not be understood in a defamatory sense by reasonable people. The motion was denied by the trial court and was appealed to the Wisconsin Supreme Court. The Supreme Court affirmed the trial court stating: "[r]easonable people could conclude that a person's being fired would tend to injure their reputation in the popular sense or to diminish the respect or esteem that people have for him."[1] The complaint was therefore found to be legally sufficient to state a claim.

The matter was remanded to the trial court and Mertz and McGraw-Hill separately answered the complaint. After interrogatories and answers thereto were exchanged, and depositions were taken, Mertz and McGraw-Hill moved for summary judgment. The trial court held that Denny had "thrust himself to the forefront" of a public controversy, thus making himself a "public figure." He was therefore required to establish actual malice to recover for an allegedly libelous statement. The court concluded that since the affidavits, depositions and interrogatories failed to show the existence of actual malice on the part of Mertz and/or McGraw-Hill, Mertz and McGraw-Hill were both entitled to summary judgment.

The overriding issue on appeal is whether Denny must establish actual malice in order to recover for libel. This can be broken down into two subissues: (1) Did Koehring's management problems constitute a matter of public concern; and, (2) If so, was Denny's involvement in and conduct with respect to Koehring's problems such that it made him a public figure.

We determine that Koehring's internal disputes and management problems were not matters of "public controversy" such that Denny's prominent role therein made him a "public figure" required to prove actual malice

[1] *Denny v. Mertz*, 84 Wis.2d 654, 662, 267 N.W.2d 304, 309 (1978).

in a libel action. We accordingly reverse the summary judgments in favor of Mertz and McGraw-Hill.

In the seminal case of *New York Times Co. v. Sullivan*[2] the United States Supreme Court stated that before public officials can recover damages under state libel laws for a false statement relating to their official conduct, they are required to prove actual malice. Actual malice means that the claimed libelous statement was made with knowledge that it was false or with reckless disregard of whether it was false or not.[3] This rule was designed to protect the first amendment rights of free speech and unfettered fair comment on the activities of public officials.[4] The Court reasoned that since the unhampered discussion of public issues is essential to our system of government, even erroneous statements that are "inevitable in free debate . . . must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive' . . . ."[5] The rules protecting first amendment rights are applicable to state libel laws through the fourteenth amendment.[6]

The first amendment limitations on state libel laws were later broadened to protect false statements made about a "public figure" who obtained that status either by his notorious position alone or by specific activities which thrust his personality into the vortex of an important public controversy.[7] In *Gertz v. Welch*[8] the Supreme Court made clear that the states are free to establish the standards of liability for libel where private

---

[2] 376 U.S. 254 (1964).

[3] *Id.* at 279–80.

[4] *Id.* at 269.

[5] *Id.* at 270–72.

[6] *Id.* at 277.

[7] *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 154–55 (1967). (Harlan, J. plurality).

[8] 418 U.S. 323 (1974).

persons are concerned as long as liability without fault is not imposed.[9]

Generally, public figures are persons who have "assumed roles of especial prominence in the affairs of society."[10] Among them are those in positions of such power and influence that they are considered public figures for all purposes. Also among them are those who have become so prominently and actively involved in an effort to influence the resolution of particular public controversies that they too are thought to have "invite[d] attention and comment."[11] This second category of persons are considered public figures for a limited range of issues.[12]

It is crucial in the context of this case to recognize that "public controversies" do not include all matters of interest to the public.[13] Hence, the simple fact that an event or a controversy captures media attention and the subsequent interest of the reading public is not, in itself, enough to make the persons involved "public figures." Newsworthiness does not create a public controversy.[14] "A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way."[15] A public controversy is a dispute having foreseeable and substantial ramifications for nonparticipants.[16]

---

[9] *Id.* at 347.

[10] *Id.* at 345.

[11] *Id.*

[12] *Id.* at 351.

[13] *Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 167–68 (1979); *Time, Inc. v. Firestone,* 424 U.S. 448, 454 (1976); *Prahl v. Brosamle,* 98 Wis.2d 130, 144, 295 N.W.2d 768, 777 (Ct. App. 1980).

[14] *Wolston* and *Prahl,* note 13 *supra.*

[15] *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296 (D.C. Cir. 1980).

[16] *Id.* at 1297.

We reject the trial court's finding that the stockholders' battle at Koehring was a "public controversy." The conflicts at Koehring were, at best, newsworthy matters resulting in some general public interest.

Mertz testified at his deposition on the impact of the *Business Week* article:

Did you ever call Mr. Santry or anybody at Business Week and make your views known?

No. I decided that first not many people were going to read the article. My friends wouldn't believe it. My enemies would, and the rest of the people didn't care, so why bother.

This is a fair assessment of the limited "public" nature of the controversy.

Certainly, Denny thrust himself into the vortex or forefront of the Koehring stockholders' "battle" and attempted to have an impact on and to influence the outcome of that controversy. His activities were not trivial or tangential and he did achieve special prominence within the circle of the Koehring stockholders involved. However, the dispute was only between Koehring stockholders and management. Only those involved in the dispute would feel any appreciable impact from its resolution. It was of no substantial concern to the general public.

Further, the local press coverage of the battle was limited to the articles in *The Milwaukee Journal* on February 27, 1975, and the *Milwaukee Sentinel* on February 28, 1975, recording Denny's two attempts to get records from Koehring.[17] Two other articles recorded the annual stockholders' meeting in which Denny played a prominent role. These are the only articles in the record which made the public aware Denny's role in the "battle."

---

[17] Although not determinative, the extent of press coverage is a relevant factor to consider in determining whether a public controversy is involved. *See id.*

The trial court held that because Denny was in contact with the *Wall Street Journal* and *Business Week,* he became a public figure. We disagree. Denny did initiate the *Wall Street Journal* contact. However, it does not follow that Denny thereby surrendered his status as a private person. Further, the record discloses that the *Wall Street Journal* printed three articles concerning the Koehring controversy on April 9, 1975, April 28, 1975, and July 16, 1975, and none of the articles made any reference to Denny.

Denny's contact with *Business Week* was initiated by the *Business Week* editor, Santry. He had three contacts with Santry through which he provided Santry with various documents relating to the Koehring dispute. Santry also contacted others involved in the Koehring dispute before the January 19, 1976, *Business Week* article was published. This contact with Santry did not convert Denny into a public figure. He was simply a source of information for an article on a matter of concern to a limited number of people.

Overall, the extent of the press coverage was minimal and the record discloses no public reaction to Denny's conduct or statements.[18]

To raise a stockholder dispute of the type involved here to the level of a "public controversy" such that its prominent participants become public figures, would be to impermissibly broaden the class of persons who must prove actual malice when they have been defamed. Such a determination might have a chilling effect on disgruntled stockholders exercising their rights to object to corporate management policies.

We have examined the pleadings, the interrogatories, and the answers to the interrogatories. We have read

---

[18] Public reaction is another factor to consider in determining whether one is a public figure. *See id.*

the depositions and the affidavits attached to the motions for summary judgment as required,[19] and hold that the stockholders' battle at Koehring was not a matter of public controversy or concern. We further hold that Denny, at no time, lost his status as a private person. He did not achieve the status of a public person because of his activities as a stockholder, even though he surely thrust himself wholly into the vortex of the Koehring stockholders' "battle."

Summary judgments are reversed and the matter is remanded for trial under the restrictions of the Wisconsin libel laws.

On the day of oral argument Denny filed a supplemental appendix containing eighteen pages of excerpts from depositions that were in the appeal record. He further filed copies of sections of the *Restatement of Torts* and reported decisions that were available before the filing of his reply brief, with the exception of *Prahl v. Brosamle*,[20] which was released subsequent to the filing of his reply brief. Nowhere in the rules of this court is there provision for such late filing. We reject the documents and deny costs for their preparation.[21]

*By the Court.*—Judgments reversed.

---

[19] *Grams v. Boss*, 97 Wis.2d 332, 338, 294 N.W.2d 473, 476–77 (1980); *Wright v. Hasley*, 86 Wis.2d 572, 578–79, 273 N.W.2d 319, 322–23 (1979).

[20] *Prahl*, note 13 *supra*.

[21] *See* sec. 809.83(2), Stats.